IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CAMITT DOUGHTON,

           Petitioner,                  No. 2: 11-cv-2252 JAM KJN P

    vs.

WARDEN McDONALD, et al.,

           Respondents.        <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

I. <u>Introduction</u>

        Petitioner is a state prisoner, proceeding without counsel, with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2008 convictions for the following crimes: 1) Count 1:  first degree murder in commission of a robbery, i.e. felony murder (Cal. Penal Code §§ 187(a), 211, 190(a)(17)); use of a firearm during the felony murder causing great bodily injury to Larry Elliott (Cal. Penal Code § 12022.53(d)); 2) Count 2: robbery of Larry Elliott in an inhabited dwelling (Cal. Penal Code § § 211, 213(a)(1)(A)); use of a firearm during the robbery causing great bodily injury to Larry Elliott (Cal. Penal Code § 12022.53(d)); 3) Count 3: robbery of Heidi Mackelvie in an inhabited dwelling (Cal. Penal Code § 211, 213(a)(1)(A)); use of a firearm during this robbery (Cal. Penal Code § 12022.53)); and 4) Count 4: possession of a firearm by a convicted felon (Cal. Penal Code § 12021(a)(1)).  (Court

1

1   Reporter's Transcript ("CT") at 573-76.)

2        For count one, petitioner was sentenced to life without the possibility of parole for

3 the murder conviction plus 25 years for the firearm enhancement.  (CT at 93-95.)  Petitioner was

4 sentenced to 6 years for count three, plus 10 years for the firearm enhancement.  (Id.)  Petitioner

5 was sentenced to 2 years on count four.  (Id.)  The sentences for counts three and four were to run

6 concurrent to his life sentence.  (Id.)  Petitioner's sentence on count two and its firearm

7 enhancement was stayed.  (Id.)

8        This action is proceeding on the amended petition filed June 1, 2012.  (Dkt. No.

9 11.)  Petitioner challenges his conviction on the following grounds: 1) denial of right to cross-

10 examine an adverse witness; 2) jury instruction error (two claims); 3) impermissibly suggestive

11 identification by witness; 4) ineffective assistance of counsel; 5) ineffective assistance of

12 appellate counsel; and 6) insufficient evidence.

13        After carefully reviewing the record, the undersigned recommends that the

14 petition be denied.

15 II.  Standards for a Writ of Habeas Corpus

16        An application for a writ of habeas corpus by a person in custody under a

17 judgment of a state court can be granted only for violations of the Constitution or laws of the

18 United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the

19 interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

20 Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

21        Federal habeas corpus relief is not available for any claim decided on the merits in

22 state court proceedings unless the state court's adjudication of the claim:

23
24       (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

25
26       (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

1   28 U.S.C. § 2254(d).

2         Under section 2254(d)(1), a state court decision is "contrary to" clearly

3   established United States Supreme Court precedents if it applies a rule that contradicts the

4   governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

5   indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

6   result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06

7   (2000)).

8         Under the  "unreasonable application" clause of section 2254(d)(1), a federal

9   habeas court may grant the writ if the state court identifies the correct governing legal principle

10  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

11  prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

12  simply because that court concludes in its independent judgment that the relevant state-court

13  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

14  application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

15  (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

16  question, is left with a 'firm conviction' that the state court was 'erroneous.'") (internal citations

17  omitted).  "A state court's determination that a claim lacks merit precludes federal habeas relief

18  so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

19  Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

20        The court looks to the last reasoned state court decision as the basis for the state

21  court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  If there is no reasoned

22  decision, "and the state court has denied relief, it may be presumed that the state court

23  adjudicated the claim on the merits in the absence of any indication or state-law procedural

24  principles to the contrary."  Harrington, 131 S. Ct. at 784-85.  That presumption may be

25  overcome by a showing that "there is reason to think some other explanation for the state court's

26  decision is more likely."  Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

1        Where the state court reaches a decision on the merits but provides no reasoning

2 to support its conclusion, the federal court conducts an independent review of the record.

3 "Independent review of the record is not de novo review of the constitutional issue, but rather,

4 the only method by which we can determine whether a silent state court decision is objectively

5 unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). Where no reasoned

6 decision is available, the habeas petitioner has the burden of "showing there was no reasonable

7 basis for the state court to deny relief." Harrington, 131 S. Ct. at 784. "[A] habeas court must

8 determine what arguments or theories supported or, . . . could have supported, the state court's

9 decision; and then it must ask whether it is possible fairminded jurists could disagree that those

10 arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at

11 786.

12 III.  Factual Background

13        The opinion of the California Court of Appeal contains a factual summary.  After

14 independently reviewing the record, the undersigned finds this summary to be substantially

15 accurate.  With the inaccuracies noted below, the state appellate court's factual summary is

16 adopted herein:

> On the evening of December 9, 2004, Kobra Turner drove her boyfriend, Edward Quintanilla, to a Value Inn Motel in Sacramento.  Doughton, [Deandre] Scott, and Danny Hampton arrived at the motel shortly thereafter. Approximately 15 minutes later, Quintanilla called Turner and asked her to give Scott a ride. Turner drove Scott to his house, where he spent a few minutes inside before being driven back to the Value Inn.
>
> Later that evening, the four men set out from the motel in two cars, one driven by Scott and the other by Turner. The drivers parked their cars at a park near the home of Larry Elliott.
>
> Elliott was expecting Hampton to come by to purchase marijuana.  Hampton and Doughton told Scott and Quintanilla that they "were going up to the house and said they would call when they knew the guy was there."
>
> A few minutes later, Quintanilla received a call on his cell phone.  He said they would be "right there" and gave the phone to Turner.  Quintanilla and Scott left their cars and walked into the park.

Hampton and Doughton found Elliott in his garage making music with James Willis and George Porter.  Hampton and Doughton expressed interest in buying marijuana and smoked a sample at Elliott's invitation.

About seven minutes after Hampton and Doughton arrived, Quintanilla and Scott rushed into the garage wearing black ski masks.  Doughton brandished a revolver.[1]  Willis became scared and got down on the ground.

One of the assailants began hitting Elliot.  Elliott yelled out, "Stop, ya'll are killing me."  One of the masked men shouted, "[W]here's the money?  Where's the weed?  Where's the keys to [the] car?"  Elliott responded that he did not have any money because he had just spent it on a truck. While Elliott was being beaten in an effort to obtain the location of his stash of drugs and money, the other assailants entered the house.

Elliott's girlfriend, Heidi Mackelvie, awoke from a nap to find a semi-automatic gun held to her head.  Mackelvie also saw two masked men rummaging around the house.  Mackelvie immediately complied with an order to lie on the floor.

Mackelvie and Elliott had a one-year-old son who was sleeping in one of the bedrooms.  She pleaded for her son to be left alone, and one of assailants responded that he would not bother the baby.  Doughton repeatedly demanded that Mackelvie tell him "where the money is."  Mackelvie retrieved $140 from her purse and handed it to him.

Mackelvie heard someone from the garage say, "If somebody doesn't tell me where the fuck the money is, somebody is gonna get popped."  When the masked men left her alone for a moment, Mackelvie got up and ran to a neighbor's house to call the police.

In the garage, one of the assailants told Elliott that he was going to get shot if he said another word.  Scott, Quintanilla, and Hampton left while Doughton remained in the garage. Willis heard Doughton say, "I told you not to look up." Willis then heard a gunshot. Doughton came up behind Willis and warned him not to say anything. Doughton left the garage and ran toward the park.

Elliot died of a gunshot wound to his head.

Turner had been waiting for about 20 minutes when Quintanilla and Scott came running toward the car.  A few moments later, Hampton and Doughton also came running.  Quintanilla got into Turner's car with a tall plastic bucket and said, "Go, go, go."  Once in the car, Quintanilla asked, "Who capped him?"  Both cars drove to Quintanilla's house, and they all went inside.  A few hours later, Turner noticed that the other men had departed.

The next day, Doughton and Hampton showed up at the apartment of Brandi Cummings in Tracy, California.  Hampton was carrying a small backpack

---

[1]  The undersigned cannot locate in the record any testimony indicating that petitioner brandished a revolver at the time when Quintanilla and Scott arrived.

1   inscribed with the name of Quintanilla's brother.  Hampton left the next morning,
2   but Doughton stayed with Cummings for several more days.  Doughton and
    Hampton left the backpack behind.  A subsequent search of the backpack by the
3   police revealed items including several plastic bags containing marijuana
    packaged for sale.  Doughton's fingerprint was on one of the bags.

4   On December 12, 2004, Quintanilla traveled by bus to La Grande, Oregon.
    Turner followed him a few days later.  After Quintanilla told Turner what had
5   happened at Elliott's house, Turner convinced him to surrender to the police.

6   Doughton and Hampton were arrested in Sacramento, California, on December
    17, 2004. Scott was arrested in Phoenix, Arizona, on February 3, 2006.  Scott did
7   not have permission to be in Arizona.

8   (Respondent's Lodged Document 18 at 2-5.)

9   IV.  <u>Discussion</u>

10       A.  <u>Claim 1: Denial of Right to Cross-Examine Witness</u>

11       Petitioner alleges that he was denied his right to cross-examine prosecution

12   witness James Willis regarding his previous involvement in a shooting incident.  Petitioner

13   alleges that the trial court's order to exclude evidence of the shooting evidence violated his Sixth

14   Amendment right to confront adverse witnesses.  On appeal, the California Court of Appeal

15   denied this claim for the reasons stated herein:

16       Doughton contends the trial court abused its discretion in excluding evidence that
         Willis was involved in a shooting accident prior to the fatal shooting in this case.
17       We disagree.

18       A

19       Willis testified that he heard a gunshot immediately after Doughton said to Elliott,
         "I told you not to look up." Doughton then came up behind Willis and threatened,
20       "Don't tell nobody." Willis looked up to see Doughton running away and a pool
         of blood on the garage floor. With a surge of adrenaline, Willis "just ran."
21
22       When the prosecutor asked why he ran, Willis responded: "I never really seen
         nothing like that, so, kind of shocking. So I just-just ran."

23       During cross-examination, Doughton's counsel sought to cast Willis as another
         accomplice to the robberies. Defense counsel also returned to the question of why
24       Willis ran away:

25       "Q. You indicated that you were pretty upset because you didn't know what to do,
         so you ran off because nothing like this had ever happened before, is that right?
26

6

"A. [by Willis] Yes.

"Q. You'd never experienced anything like this before?

"A. Yes.

"Q. Never experienced any gunplay before?

"A. Not like that.

"Q. Not like that?

"A. To the resulting in death or major injuries.

"Q. So that, of course, excludes the time you got shot in the ankle on October 3rd, 2003?

"[The prosecutor]: Objection, your Honor, objection, relevance.

"THE COURT: Sustained."

Later, outside the presence of the jury, the trial court held an Evidence Code section 402 hearing. FN2 During the hearing, Willis testified that he had been shot in October 2003 by a female cousin. His cousins had gotten into an argument that escalated in tension. When Willis tried to break up the fight, he got caught in the crossfire and was accidentally shot in the ankle. Willis explained that the 2003 shooting was not "as dramatic" as Elliott's murder because he was "just an innocent bystander" who got caught in the line of fire.

> FN2. Subdivision (b) of Evidence Code section 402 provides, "The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury; but in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests."

Doughton's counsel sought to introduce evidence of the 2003 shooting to show that Willis was naturally calm around gunshots and his reason for running after Elliott's death was due to Willis's role as an accomplice. The trial court rejected the argument and excluded the testimony. The court explained:

"I'm not going to allow the evidence nor the questioning regarding that October '03 incident in which Mr. Willis indicated he was shot in the ankle. I do not see the probative value whatsoever. It's not connected to anything involving this case. It's not connected to any of the parties in this case. It's not connected to Mr. Hampton. It's not connected to the decedent, nor his girlfriend, nor [Porter]. It has nothing to do with the drugs. It has nothing to do with the sales of drugs. [¶] It appears to be just a random act, as the testimony indicated, in which Mr. Willis was shot when he appeared at a scene involving girl cousins fighting. So I do not see the probative value. So I'll disallow any evidence on that."

B

A trial court's exclusion of evidence offered for impeachment is reviewed for abuse of discretion. (People v. Ledesma (2006) 39 Cal.4th 641, 705.) On this point, we have explained the "abuse of discretion standard requires the reviewing court to uphold the exclusion of evidence unless the reviewing court finds the trial court acted arbitrarily, capriciously, or in a patently absurd manner and that the exclusion of the evidence resulted in a manifest miscarriage of justice." (People v. Foss (2007) 155 Cal.App.4th 113, 125; see also People v. Ledesma, supra, at p. 705)

We find no abuse of discretion in the trial court's exclusion of evidence regarding Willis's involvement in the 2003 shooting. The 2003 shooting was unrelated to the shooting of Elliott. The accidental nature of the 2003 shooting stands in contrast to the deliberate taking of Elliott's life. Willis's statement that he ran after seeing a pool of blood on the garage floor would not have been undermined by the fact that he did not panic after being accidentally shot in the ankle by a family member. The trial court did not err in determining evidence of the 2003 shooting to be nonprobative in this case.

C

Even if the trial court had erred in excluding the evidence of the 2003 shooting, we would affirm nonetheless. Willis's testimony was not necessary to prove that Elliott was murdered by a gunshot to his head. Willis's testimony was also not necessary to prove Doughton was one of the robbers. Both Turner and Mackelvie identified Doughton as one of the robbers. Mackelvie, in particular, expressed confidence in her identification of Doughton as the one who put a gun to her head.

Although Willis's testimony painted a more complete picture of the tragic events in Elliott's garage, it was corroborated as to the robbery by Turner and Mackelvie and as to the murder by the forensic pathologist. Although Doughton seeks to cast doubt on the strength of the testimony by Turner and Mackelvie, we do not reweigh the evidence on appeal. (People v. Hatch (2000) 22 Cal.4th 260, 272 .)

Viewed in a light most favorable to the judgment, the evidence adduced at trial sufficed to convict Doughton even if his counsel had succeeded in entirely discrediting Willis. Even if the trial court had erred in excluding evidence of the 2003 shooting involving Willis, the absence of the error would not have yielded a result more favorable to Doughton. (People v. Watson (1956) 46 Cal.2d 818, 836.)

(Respondent's Lodged Document No. 18 at 5-9.)

*Standard for Review of State Court Opinion*

On habeas review, the federal court "look[s] to the last reasoned decision of the state court as the basis of the state court's judgment." Womack v. Del Papa, 497 F.3d 998, 1002 (9th Cir. 2007). "Where there has been one reasoned state judgment rejecting a federal claim,

8

1   later unexplained orders upholding that judgment or rejecting the same claim rest upon the same

2   ground." Merolillo v. Yates, 663 F.3d 444, 453 (9th Cir. 2011), quoting Ylst v. Nunnemaker,

3   501 U.S. 797, 803 (1991).

4          The California Supreme Court denied petitioner's petition for review without

5   comment or citation.  (Respondent's Lodged Document No. 20.)  Accordingly, the undersigned

6   "looks through" the California Supreme Court's summary denial of the petition for review and

7   examines the California Court of Appeal's opinion, the last reasoned state court opinion.

8          The California Court of Appeal did not address the merits of petitioner's Sixth

9   Amendment claim in its reasoned opinion.  "When a state court rejects a federal claim without

10  expressly addressing that claim, a federal habeas court must presume that the federal claim was

11  adjudicated on the merits – but the presumption can in some limited circumstances be rebutted."

12  Johnson v. Williams, 133 S. Ct. 1088, 1096 (2013).  When the state precedent incorporates the

13  related constitutional right, then the presumption that the state court adjudicated the federal claim

14  is not rebuttable.  Id. at 1094-95.

15          In the instant case, the California standard for evaluating the exclusion of

16  evidence offered to impeach a prosecution witness is very close to the federal standard for

17  evaluating whether the exclusion of impeachment evidence violated the Confrontation Clause.

18  Both standards involve consideration of the relevancy of the excluded evidence and whether

19  "legitimate interests" weigh in favor of exclusion.  See People v. Ledesma, 39 Cal.4th 641, 705

20  (2006), citing Delaware v. Van Arsdall, 475 U.S. 673, 679-80 (1986);  People v. Rodriguez, 20

21  Cal.4th 1, 9-10 (1999);  Wood v. Alaska, 957 F.2d 1544, 1549–50 (9th Cir. 1992) citing

22  Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).  Accordingly, the undersigned presumes that

23  the California Court of Appeal considered petitioner's federal claim.

24          A federal court lacking a written opinion from a state court addressing the merits

25  of a federal claim undertakes an independent review of the record.  Pirtle v. Morgan, 313 F.3d

26  1160, 1167 (9th Cir. 2002); see also Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000)

1   ("Federal habeas review is not de novo when the state court does not supply reasoning for its

2   decision, but an independent review of the record is required to determine whether the state court

3   clearly erred in its application of controlling federal law.")  Nonetheless, the federal court must

4   "still defer to the state court's ultimate decision." Pirtle, 313 F.3d at 1167.  Thus, the

5   undersigned conducts an independent review of petitioner's Sixth Amendment claim giving

6   deference to the denial of this claim by the state courts. See Delgado, 223 F.3d at 982.

7              *Analysis*

8              The Confrontation Clause of the Sixth Amendment guarantees a criminal

9   defendant the right to cross-examine adverse witnesses in order to test their credibility and the

10  truth of their testimony. Davis v. Alaska, 415 U.S. 308, 315–16 (1974).  Therefore, under some

11  circumstances, restrictions on the scope of a defense attorney's cross-examination of a

12  prosecution witness may violate the defendant's right to confront witnesses. Delaware v.

13  Fensterer, 474 U.S. 15, 18–19 (1985).  Similarly, a defendant has the right under the Due Process

14  Clause to call witnesses on his own behalf, and the exclusion of a witness whose testimony

15  possesses impeachment value may violate that right. Alcala v. Woodford, 334 F.3d 862, 877

16  (9th Cir. 2003).  The Constitution, however, does not guarantee a defendant the right to impeach

17  a witness in whatever way and to whatever extent he or she wishes. Fensterer, 474 U.S. at 20.

18  Trial judges retain wide latitude to impose reasonable limits on impeachment based on concerns

19  about, among other things, harassment, prejudice, confusion of the issues, repetition, or marginal

20  relevance. Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986); Carriger v. Lewis, 971 F.2d 329,

21  333 (9th Cir. 1992).  All that the Constitution demands is substantial compliance with the

22  purpose behind the confrontation requirement—that is, that the prosecution's evidence be

23  subjected to rigorous testing before the trier of fact. Walters v. McCormick, 122 F.3d 1172,

24  1176 (9th Cir. 1997).

25              In determining whether petitioner's confrontation rights were violated, the court

26  conducts a two-part inquiry. See Wood v. Alaska, 957 F.2d 1544, 1549–50 (9th Cir. 1992).

First, the court considers whether the excluded evidence is relevant.  If the excluded evidence is

not relevant, there is no constitutional violation.  If the excluded evidence is relevant, the court

then considers whether other legitimate interests outweigh the defendant's interest.  See Wood,

957 F.2d at 1550.  Further, if a constitutional error occurred, habeas relief is warranted only if

such error "had substantial and injurious effect or influence in determining the jury's verdict."

Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).

        The undersigned has reviewed the portion of the transcript where the trial court

conducted the hearing pursuant to California Evidence Code § 402 to determine the relevancy of

Willis's involvement in the previous shooting.  (Reporter's Transcript ("RT") at 786-97.)  The

trial court ruled that the evidence regarding the October 2003 shooting where Willis was shot in

the ankle had no "probative value whatsoever."  (Id. at 798.)  As noted by the California Court of

Appeal, the trial court ruled that the shooting was not connected to any of the parties in

petitioner's case and had nothing to do with drugs.  (Id. at 798-99.)  The trial court ruled that the

October 2003 shooting was a random act where Willis was shot when he appeared at a scene

where his girl cousins were fighting.  (Id.)

        In his direct appeal in state court, petitioner argued that evidence of the October

2003 shooting was relevant because it tended to contradict Willis's claim that in December 2004,

i.e., during the robbery and murder of Larry Elliott, he ran away because he had never

experienced gun violence like that before.  (Respondent's Lodged Document 15 at 9.)  As noted

by the trial court, the October 2003 incident was different from the shooting involved at

petitioner's trial.  The October 2003 shooting was a random act which occurred when his girl

cousins were fighting.  Because of the differences in the shootings, evidence of the October 2003

shooting would not have impeached Willis's testimony that he ran away after Elliot was shot

because he had never experienced gun violence like that before.

        In his direct appeal in state court, petitioner also argued that evidence of the

October 2003 shooting was relevant because it impeached Willis "by contrast."  (Id.)  Petitioner

argued that at the 402 hearing, Willis testified that at the time of the October 2003 shooting, he was outside when someone came up to him and told him that his female cousins were fighting around the corner.  (Id.)  Willis testified that he walked up to the crowd and ordered his cousins home.  (Id.)  As they were leaving, Willis turned around and looked to see what was going on. (Id.)  That moment is when guns were pulled out and he got shot.  (Id.)  Willis ran after he shot because he was trying to get help for his foot.  (Id.)

In his direct appeal, petitioner argued that in the October 2003 incident, Willis showed a "steadiness in a volatile situation when he confronted the crowd.  This gave way to flight only in the face of actual gun danger."  (Id.)  Petitioner argued that yet on December 9, 2004, when all the gun danger dissipated, Willis fled, failing to help his friends or the police under less threatening circumstances.  (Id. at 9-10.)  Petitioner argued that evidence that Willis ran away after the "less threatening" 2004 shooting incident supported a defense theory that Willis was an accomplice.

Petitioner's argument that the 2003 shooting incident constitutes impeachment "by contrast" is a stretch.  Petitioner's characterization of the circumstances of the 2004 shooting incident as "less threatening" than the 2003 shooting incident is not persuasive.  The 2003 shooting did not involve a robbery where someone was intentionally shot in the head. Petitioner's argument that the 2003 shooting was impeachment by "contrast" is not supported by the record.

For the reasons stated by the California Court of Appeal addressing petitioner's related state law claim, the undersigned finds that evidence of the of the 2003 shooting was unrelated to the shooting at issue in petitioner's trial.  Because this excluded evidence was not relevant, no constitutional violation occurred.  Accordingly, after conducting an independent review of the record, the undersigned finds that the denial of petitioner's Sixth Amendment claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority.

1        B.  Claims 2 and 3: Jury Instruction Error

2            *Legal Standard for Jury Instruction Error*

3            A  challenge to a jury instruction solely as an error under state law does not state a

4   claim cognizable in federal habeas corpus proceedings.  See Estelle v. McGuire, 502 U.S. 62,

5   71–72 (1991).   To obtain federal collateral relief for errors in the jury charge, a petitioner must

6   show that the ailing instruction by itself so infected the entire trial that the resulting conviction

7   violates due process.  Estelle, 502 U.S. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see

8   also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely

9   that the instruction is undesirable, erroneous, or even "universally condemned," but that it

10  violated some [constitutional right].'").  However, the defined category of infractions that violate

11  the fundamental fairness inherent in due process is very narrow:  "Beyond the specific guarantees

12  enumerated in the Bill of Rights, the Due Process Clause has limited operation."  Estelle, 502

13  U.S. at 73.

14          A habeas petitioner is not entitled to relief unless the instructional error "'had

15  substantial and injurious effect or influence in determining the jury's verdict.'"  Brecht v.

16  Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776

17  (1946).  In other words, state prisoners seeking federal habeas relief may obtain plenary review

18  of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted

19  in "actual prejudice."  Id. (citation omitted).

20          *Instruction Regarding Flight*

21          Petitioner argues that the trial court erred by giving an instruction regarding flight.

22  The California Court of Appeal denied this claim for the reasons stated herein:

23          Defendants contend the trial court erred in instructing the jury with CALCRIM
            No. 372 regarding flight. Scott argues that there was no substantial evidence to
24          support the giving of the instruction. Doughton contends the instruction "is
            argumentative, casting the evidence in the light most prejudicial to the defendant,
25          and thereby denying due process...." We reject the contentions.

26  ////

A

During the jury instruction conference, the prosecution requested a flight instruction on grounds that it was required by section 1127c. FN3  Over objection by Scott and Doughton, the trial court gave CALCRIM No. 372 as follows:

> FN3. Section 1127c provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] No further instruction on the subject of flight need be given."

"If the defendant fled or tried to flee immediately after the crime was committed or after he was accused of committing the crime, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

B

The California Supreme Court has "construed section 1127c 'as mandating a rule that if there is evidence identifying the person who fled as the defendant, and if such evidence is relied on as tending to show guilt, then a flight instruction is proper.' (People v. Roberts (1992) 2 Cal.4th 271, 310.) 'A flight instruction is proper whenever evidence of the circumstances of [a] defendant's departure from the crime scene ... logically permits an inference that his movement was motivated by guilty knowledge.' (People v. Turner [ (1990) ] 50 Cal.3d [668,] 694.)" (People v. Abilez  (2007) 41 Cal.4th 472, 521-522.)

****

C

Doughton acknowledges, "it is futile to argue that his excursion to Tracy did not support a flight instruction in the instant case." Nonetheless, he argues CALCRIM No. 372 violated his due process right to a fair trial. Specifically, Doughton contends the instruction violates a defendant's right to due process by emphasizing evidence of flight. We disagree.

In allowing a permissible inference of consciousness of guilt from evidence of flight, CALCRIM No. 372 does not give undue weight to evidence of flight. In People v. Mendoza (2000) 24 Cal.4th 130, at page 180, the California Supreme Court held "A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." Thus, allowing "a jury to infer, if it so chooses, that the flight of a defendant immediately after the commission of a crime

1    indicates a consciousness of guilt" does not violate due process. (Ibid.; see also
     People v. Hernandez Rios (2007) 151 Cal.App.4th 1154, 1157-1158.) Moreover,
2    as the Attorney General points out, even if the jury relied on CALCRIM No. 372
     to infer consciousness of guilt, the instruction cautioned that evidence of flight
3    alone failed to support a conviction.

4    The jury was also instructed with CALCRIM No. 200. In pertinent part, the
     instruction states: "Some of these instructions may not apply, depending on your
5    findings about the facts of the case. Do not assume just because I give you a
     particular instruction that I am suggesting anything about the facts. After you have
6    decided what the facts are, follow the instructions that do apply to the facts as you
     find them." Thus, the jury was not required to find that defendant fled or that his
7    flight proved consciousness of guilt.

8    The jury was properly instructed on the permissible inference that, if jurors found
     evidence of flight, they could infer consciousness of guilt. Accordingly, we reject
9    Doughton's due process challenge to CALCRIM No. 372.

10   (Respondent's Lodged Document 18 at 10-14).

11          The California Court of Appeal was the last state court to issue a written opinion

12   addressing this claim.  While the California Court of Appeal cited no federal law in analyzing

13   petitioner's due process claim, it cited People v. Mendoza, 24 Cal.4th 130 (2000).  In Mendoza,

14   the California Supreme Court applied federal law in determining whether the flight instruction

15   contained a permissible inference of consciousness of guilt.  See Mendoza, 24 Cal.3d at 180

16   (cases cited therein).

17          The citation to Mendoza indicates that the California Court of Appeal considered

18   the merits of petitioner's federal claim challenging the flight instruction.  Although the California

19   Court of Appeal did not analyze the federal claim in its reasoned opinion, the undersigned

20   conducts an independent review of the record, giving deference to the denial of this claim by the

21   state courts.  See Delgado, 223 F.3d at 982.

22          CALCRIM No. 372 expressly provided that evidence of flight was not, by itself,

23   sufficient to support a finding of guilt.  (See Supplemental Clerk's Transcript at 36.)  Thus,

24   contrary to petitioner's contention, this instruction did not create an impermissible mandatory

25   presumption regarding consciousness of guilt; nor did it relieve the prosecution of its burden of

26   proving every element of the crimes at issue beyond a reasonable doubt.  See Francis v. Franklin,

471 U.S. 307, 314–15 (1985) (permissive instructions do not violate due process if suggestive

inference is supported by reason and common sense in light of facts presented).

         After independently reviewing the record, the undersigned finds that the denial of

this claim by the California Court of Appeal was not an unreasonable application of clearly

established Supreme Court authority.  Accordingly, this claim should be denied.

         *Instruction Regarding Reasonable Doubt*

         Petitioner challenges the jury instruction regarding reasonable doubt, CALCRIM

No. 220.  (See Supplemental Clerk's Transcript at 15.)  The California Court of Appeal rejected

this claim for the reasons stated herein:

> The trial court instructed the jury with CALCRIM No. 220 as follows:
>
> "The fact that a criminal charge has been filed against the defendants is not evidence that the charge is true. You must not be biased against the defendants just because he [ sic ] has been arrested, is in custody, charged with a crime, or brought to trial.
>
> A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt.
>
> Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.
>
> In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendants guilty beyond a reasonable doubt, he [ sic ] is entitled to an acquittal and you must find him not guilty."
>
> Defendant Doughton contends this instruction is constitutionally deficient.
>
> It is not. (People v. Zavala (2008) 168 Cal.App.4th 772; People v. Zapeda (2008) 167 Cal.App.4th 25; People v. Ramos (2008) 163 Cal.App.4th 1082; People v. Garelick (2008) 161 Cal.App.4th 1107; People v. Campos (2007) 156 Cal.App.4th 1228; People v. Flores (2007) 153 Cal.App.4th 1088; People v. Westbrooks (2007) 151 Cal.App.4th 1500; People v. Hernandez Rios, supra, 151 Cal.App.4th 1154.)

(Respondent's Lodged Document No. 18 at 14-15.)

1        Although the California Court of Appeal cited no federal law rejecting petitioner's

2   claim, three of the cases it cited for upholding CALJIC 2.90 cited federal law.  See People v.

3   Flores, 153 Cal.App.4th 1088, 1092-93 (2007) (citing Victor v. Nebraska, 511 U.S. 1, 5 (1994);

4   People v. Campos, 156 Cal.App.4th 1228, 1239 (2007) (citing Victor v. Nebraska, 511 U.S. 1,

5   14-15 (1994); People v. Zepeda, 167 Cal.App.4th 25, 30 (2008) (citing Victor v. Nebraska, 511

6   U.S. 1, 5 (1994).  Although it did not address petitioner's federal claim in its reasoned opinion,

7   the citations to state law cases citing Victor v. Nebraska indicate that the California Court of

8   Appeal considered the merits of petitioner's federal claim.  Accordingly, the undersigned

9   conducts an independent review of the record, giving deference to the denial of this claim by the

10  state courts.  See Delgado, 223 F.3d at 982.

11       Petitioner's state appellate brief contains his argument challenging CALCRIM

12  No. 220.  (Respondent's Lodged Document No. 15 at 15-18.)  Petitioner argues that the former

13  reasonable doubt instruction, CALJIC No. 290, defined reasonable doubt as "that state of the

14  case, which ... leaves the minds of the jurors in that condition that they cannot say they feel an

15  abiding conviction of the truth of the charge."  (Id. at 16-17.)  Petitioner argues that CALCRIM

16  No. 220 "glosses the burden of proof simply as 'proof that leaves you with an abiding conviction

17  that the charge is true.'  It is the last form that fails adequately to convey the sense of subjective

18  certitude required, and the comparison, with only a little concentration beyond the prima facie

19  similarities, should render the matter evident."  (Id. at 16-17.)

20       Petitioner's argument is foreclosed by the Supreme Court.  In Victor v. Nebraska,

21  511 U.S. 1 (1994), the Supreme Court expressly confirmed the constitutionality of defining

22  "proof beyond a reasonable doubt" as an "abiding conviction," without reference to "moral

23  certainty."  Victor, 511 U.S. at 14–15.  The Constitution does not require any specific definition

24  of reasonable doubt, but merely demands that the court "instruct[ ] the jury on the necessity that

25  the defendant's guilt be proved beyond a reasonable doubt."  Id. at 5 ("The beyond a reasonable

26  doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts

1    from defining reasonable doubt nor requires them to do so as a matter of course.").

2            The California Court of Appeal reasonably found that CALCRIM No. 220's

3    definition of reasonable doubt, and the instructions as a whole, adequately conveyed the standard

4    of proof to the jury.  Because the Supreme Court has approved language concerning an abiding

5    conviction, the California Court of Appeals rejection of petitioner's argument challenging the

6    language of the reasonable doubt instruction, which changed from "feeling an abiding

7    conviction" to "leaves you with an abiding conviction," was not an unreasonable application of

8    clearly established Supreme Court authority.  Accordingly, petitioner is not entitled to habeas

9    relief as to this claim.

10                        C.  Claim 4: Suggestive Identification

11            Petitioner challenges his identification by witness Kobra Turner.  Petitioner raised

12   this claim in state habeas proceedings.  The Sacramento County Superior Court denied this claim

13   for the reasons stated herein:

> Petitioner first claims that trial counsel was ineffective in failing to file a timely
> written motion to suppress the extra judicial identification and the in-court
> testimony prior to the preliminary hearing, or to request a physical line-up at any
> proceeding, or to challenge the identification that was made by witness Turner.
> Petitioner claims that Detective Bayles suggestively showed Turner a single
> photograph of petitioner and told her his real name before she made the
> identification.  He claims that the in-court testimony of her identification of him
> was unreliable.  He also claims that witness Mackelvie's identification of him was
> beset with problems, because at first she said she did not get a good look at the
> assailant, then described him at 5'7", then did not identify petitioner as the
> assailant until the preliminary hearing.  Petitioner also claims that appellate
> counsel was ineffective in failing to raise this issue on appeal.
>
> As this is a matter that may be based on at least some material outside the record,
> appellate counsel could not have fully raised the issue on appeal and therefore was
> not ineffective.  Regardless, as the claim of suggestive identifications is meritless,
> the claim of ineffective assistance by either trial or appellate counsel fails.
>
> As for this claim [suggestive identification], petitioner fails to set forth a prima
> facie case for relief.  Petitioner attaches a portion of a transcript of an interview of
> Turner by the detective, during which the detective showed Turner several
> photographs and asked if Turner was familiar with the persons in the photographs.
> The detective pointed out "Camitt Doughton," which is petitioner's name, and
> another person whom Turner did not recognize.  The detective then pulled out a
> different picture of that second person, and Turner said that was "Drebo"; the

detective then said that it was "Deandre Scott," the name of one of petitioner's codefendants, and said that Turner knew him "as Drebo," and said he would make himself a note.  The detective then asked, "who do you know this guy as?" and Turner responded that she did not know his name but she recognized him; the detective said "Camitt Doughton," and Turner responded that she did not think that was the one that Eddie called C.J., but that Eddie called him Shabu or something like that.  There is nothing that seems coercive or misleading in this portion of the interview.

Petitioner also attaches an unidentified transcript of testimony of Turner at an unidentified proceeding, in which Turner testified that she could not identify "Camitt Dougton."  Turner also testified that she made the statements in the above-described interview after being sick with a fever and being up all night then taking a 23 hour bus ride to Sacramento, and that she had difficulty understanding the questions put to her.  This was proper questioning of Turner on the witness stand and her responses do not evidence any suggestiveness by the detective in obtaining an identification of petitioner.

Petitioner also attaches an unidentified transcript of testimony of an unidentified witness made at an unidentified proceeding, in which the witness makes an in-court identification of petitioner.  There does not appear to be any impropriety about the in-court identification made.  The witness was also questioned about the witness's earlier identifications of petitioner; again, no impropriety is shown.

Petitioner also attaches an unidentified transcript of testimony of Mackelvie at an unidentified proceeding which appears to probably be trial, in which Mackelvie testified that she did not get a perfect look at "his" face, that she first described the gunman as 5'7" but then later that evening said he was 5'7" to 5'9" and about average size, then yesterday had said he was 5'4" to 5'5".  This does not evidence any impropriety; often, a witness's second or third identification will have some discrepancies with an initial identification, and the jury is a capable finder of fact to sort out what to believe about the identification.  There was nothing impermissible in allowing Mackelvie to testify about current and past identifications.  Nor does petitioner show that Mackelvie's identifications became impermissible at any point in time merely because Mackelvie attended all of petitioner's court appearances and saw him at each, and recognized him as the person the first time she saw him, even though she did not tell the detectives until she had seen petitioner seven or eight times.  Regardless, the transcript shows that Mackelvie was questioned extensively about how many court appearances she attended that she saw petitioner at, giving counsel an opportunity to suggest to the jury that at some point Mackelvie became convinced petitioner was the person in mind merely because she had not seen him repeatedly, or that she was hiding something by not telling the detective about her recognition of petitioner until after several court appearances.  The jury was able to weigh those considerations in determining whether to believe Mackelvie's identification or not.  There is no showing of any legal reason to have excluded the eventual identification.

Petitioner also attaches what appears to be trial testimony from the detective, about the interview with Turner.  There is nothing in that testimony to indicate that Turner's identification of petitioner was suggestive.

1    Indeed, the attachments show ordinary identifications by witnesses, and nothing about them shows anything suggestive. Petitioner gives no further detail of
2    suggestiveness, and fails to support his claim with sufficient legal citations.

3    Petitioner even attaches a copy of an unsworn declaration from himself dated April 13, 2011, in which he admits being in the garage that night, and claims that
4    while inside the garage smoking marijuana some masked men came in and made him get face down, and then did the shooting. As such, petitioner has actually
5    admitted that he was, in fact, in the garage. That gives support to the reliability of the identification made of him by the witnesses; it is not as if he were now
6    claiming that he was not there at all for mistaken identity purposes.

7    Petitioner simply fails to set forth a prima facie case showing that the identification procedures employed in this case were so impermissibly suggestive
8    as to give rise to a very substantial likelihood of irreparable misidentification. (Simmons v. United States (1968) 390 U.S. 377.) Petitioner also fails to show
9    that the identification evidence admitted was unduly suggestive, unnecessary, and unreliable under the totality of the circumstances. (People v. Kennedy (2005) 36
10   Cal.4th 595 [standard for when identification evidence admitted at trial]).

11   The only viable argument that petitioner has is that the detective's method of having Turner identify certain people in certain photographs tended to suggest that
12   the witness should select the defendant (see People v. Yoeman (2003) 31 Cal.4th 93). Even so, however, it does not appear that this took place. Rather, it appears
13   that the detective simply showed Turner photographs and asked if Turner knew who these people were, and tried to write down names that would go with the
14   photographs, names that either the detective already knew and wanted verified or needed to obtain from Turner. The transcript attached to the petition, however,
15   does not show that that was done in any way that had the detective suggest to Turner that the people whose photographs were being identified were in fact the
16   people who perpetrated the crimes. Rather, the interview appeared to be more along the lines of "do you know who this person and if so, what is that person's
17   name or is that person named so-and-so." That would not appear to be unconstitutionally suggestive.
18
     Petitioner fails to set forth a prima facie case for relief on the identification claim,
19   therefore it is denied. (In re Bower (1985) 38 Cal.3d 865.)

20   (Respondent's Lodged Document 22 at 1-4.)

21          *Standard of Review*

22          As indicated above, the Sacramento County Superior Court issued a reasoned

23   opinion addressing this claim as well as petitioner's related ineffective assistance of trial and

24   appellate counsel claims. (See Respondent's Lodged Document No. 22.) Petitioner then filed a

25   habeas corpus petition in the California Court of Appeal raising these same claims.

26   (Respondent's Lodged Document No. 23.) The California Court of Appeal denied this petition

by order citing In re Steele, 32 Cal.4th 682, 692 (2004), and In re Hillery, 202 Cal.App.2d 293

(1962).  These cases stand for the proposition that petitioner failed to demonstrate that the claims

raised in his petition filed in the state appellate court were presented in the trial court in the first

instance.

    In his habeas petition filed in the state appellate court, petitioner erroneously

checked the "no" box in the section asking if, other than a direct appeal, he had filed any other

petitions with respect to his conviction in any court.  (Respondent's Lodged Document No.23 at

17.)  Petitioner did not attach a copy of the Superior Court's order denying his petition to the

petition filed in the California Court of Appeal.

    Petitioner filed a habeas corpus petition in the California Supreme Court, raising

the same claims as were raised in the habeas petitions filed in the Superior Court and California

Court of Appeal.  (Respondent's Lodged Document No. 25.)  The California Supreme Court

denied this petition without comment or citation.  (Respondent's Lodged Document 26.)

Because the California Supreme Court's decision is summary in nature, this court "looks

through" that decision and presumes it adopted the reasoning of the California Court of Appeal,

the last state court to issue a reasoned opinion.  See Ylst v. Nunnemaker, 501 U.S. 797, 804-05

(1991).

    The denial of petitioner's habeas petition by the California Court of Appeal for

failing to first present the claims in the Superior Court, renders all claims raised in state habeas

unexhausted.  See Sweet v. Cupp, 640 F.2d 233 (9th Cir. 1981) (exhaustion doctrine requires the

presentation of federal claims to the highest state court in posture that is acceptable under state

procedural rules).  In the answer, respondent did not explicitly waive the exhaustion defense.  See

Banks v. Dretke, 540 U.S. 668, 705 (2004)("AEDPA forbids a finding that exhaustion has been

waived unless the State expressly waives the requirement.").[2]  Nevertheless, the court has the

---

[2]  Respondent does not argue that petitioner's claims raised in state habeas are
unexhausted.  The undersigned addresses the issue of exhaustion in order to determine what

1  power to deny any unexhausted claim on the merits when it is clear that the claim is not

2  colorable.  Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005).  Because the instant claim is

3  without merit, the undersigned will address it despite the lack of exhaustion.

4        Generally, unexhausted claims are reviewed de novo because there is usually no

5  state court decision on that claim, and therefore no decision to defer to under the Anti-Terrorism

6  and Effective Death Penalty Act ("AEDPA").  See, e.g., Cassett v. Stewart,406 F.3d 614, 623

7  (9th Cir. 2005); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002) (federal habeas court

8  reviews unexhausted claim de novo).  However, AEDPA's deferential standard of review may

9  apply to the instant claim because the Superior Court issued a reasoned opinion.  The

10  undersigned is aware of no authority providing specific guidance in this situation.  However, in

11  Edwards v. Harrington, 2011 WL 4434539 (C.D. Cal. 2011), the District Court was also faced

12  with an unexhausted claim and a reasoned state court decision addressing that claim.  The

13  District Court in Edwards v. Harrington decided that, in an abundance of caution, it would

14  review the claim de novo, "since, where a claim fails under de novo review, it must also fail

15  under AEDPA's more deferential standard."  2011 WL 4434539 at *10, citing Berghuis v.

16  Tompkins, 130 S. Ct. 2250, 265 (2010).  See also Kiser v. Gonzales, 2012 WL 6641899 at * 6

17  (S.D. Cal. 2012) (adopting reasoning of Edwards v. Harrington, supra.)

18        "Nevertheless, where the reasoning of a state court is relevant to the resolution of

19  a constitutional issue, that reasoning must be part of a federal habeas court's consideration even

20  under a de novo standard of review."  Id., citing Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir.

21  2008) (en banc).  Furthermore, even under de novo review, the federal habeas court will

22  generally presume the correctness of state court factual findings and defer to those findings in the

23  absence of convincing evidence to the contrary or a demonstrated lack of support in the record

24  for those findings."  Id., citing Kuhlmann v. Wilson, 477 U.S. 436, 459-60 (1986); Mayfield v.

25

26  standard of review to apply when evaluating the claims raised in the state habeas petitions.

1 Woodford, 270 F.3d 915, 922 (9th Cir. 2001).)

2 In an abundance of caution, the undersigned will also conduct a de novo review of

3 this unexhausted claim, taking into consideration the reasoning of the Superior Court.

4 *Legal Standard*

5 The Constitution prevents the use of lineup or other identification procedures that

6 are "so unnecessarily suggestive and conducive to irreparable mistaken identification that [a

7 defendant] was denied due process of law." Stovall v. Denno, 388 U.S. 293, 301–02 (1967)

8 (bracketed material added), overruled on other grounds by Griffith v. Kentucky, 479 U.S. 314,

9 107 S. Ct. 708 (1987). To determine the constitutionality of a pretrial identification procedure,

10 courts conduct a two-step inquiry. United States v. Givens, 767 F.2d 574, 581 (9th Cir. 1985).

11 First, the court determines "whether the procedure was 'so impermissibly

12 suggestive as to give rise to a substantial likelihood of irreparable misidentification.'" Id.

13 (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)). This situation may occur when

14 the procedure emphasizes the focus upon a single individual, thereby increasing the likelihood of

15 misidentification, or where police otherwise impermissibly suggest an identification. See

16 Manson v. Brathwaite, 432 U.S. 98, 116 (1977); Foster v. California, 394 U.S. 440, 443 (1969).

17 Second, if the identification procedure was impermissibly suggestive, it must be

18 decided whether it was "nonetheless reliable." Givens, 767 F.2d at 581 (quoting Manson, 432

19 U.S. at 107). Each case is considered on its own facts, Simmons, 390 U.S. at 383; and "a

20 claimed violation of due process of law in the conduct of a confrontation depends on the totality

21 of the circumstances surrounding it [ ]." Stovall, 388 U.S. at 302; see also Neil v. Biggers, 409

22 U.S. 188, 196 (1972) (confrontation must be impermissibly or unduly suggestive under the

23 totality of the circumstances). "[R]eliability is the linchpin in determining the admissibility of

24 identification testimony," and the factors to be considered include: (1) the opportunity of the

25 witness to view the criminal at the time of the crime; (2) the witness's degree of attention paid to

26 the criminal; (3) the accuracy of the witness's prior description of the criminal; (4) the level of

certainty demonstrated by the witness at the time of the confrontation; and (5) the length of time

between the crime and the confrontation.  Manson, 423 U.S. at 114.  "Against these factors is to

be weighed the corrupting effect of the suggestive identification itself."  Manson, id.; see also

Van Pilon v. Reed, 799 F.2d 1332, 1338 (9th Cir. 1986) (in-court identification may be

admissible where sufficiently reliable to outweigh corrupting effects of suggestive procedure)

(citing Manson).

Finally, even where pretrial identification procedures violated the Due Process

Clause, any such error must still be analyzed for harmlessness under the standard set forth in

Brecht, to determine if the error had a "substantial and injurious effect or influence on the jury's

verdict."  See Williams v. Stewart, 441 F.3d 1030, 1038–39 (9th Cir. 2006) (considering

allegedly unconstitutional pretrial identification procedure, and analyzing for harmlessness under

Brecht).  See also Johnson v. Sublett, 63 F.3d 926, 928–29 (9th Cir. 1995) (prejudice from

unreliable identification may be mitigated by cross-examination and other courtroom

safeguards); Simmons, 390 U.S. at 384 (1968) (danger that photo lineup technique may result in

conviction based on misidentification may be lessened by cross-examination at trial).

*Turner*

The Superior Court's description of the events surrounding Turner's identification

of petitioner is essentially correct.  The undersigned sets forth the relevant portion of the record

herein with citation to the record.

On December 23, 2004, Detective Bayles interviewed Turner.  The transcript from

this interview is contained in the court transcript.  At the outset, the undersigned observes that in

this interview, Turner identified petitioner by the nickname Shabu.  (CT at 767, 769.)  Turner

stated that there was another man there named C.J., but that person was not petitioner.  (Id.)  At

trial, witness Willis testified that petitioner was the man known as C.J.  (RT at 566.)  Willis

identified Danny Hampton as Shabu.  (RT at 557.)  After reviewing the record, it is clear that

Turner mixed up the nicknames of petitioner and the man she identified as C.J, both of whom she

did not know well.  Willis identified petitioner and Hampton by the correct nicknames, as he was familiar with both men.

Turner told Detective Bayles that after she got home from work, Eddie asked her to drive him some place.  (CT at 762.)  Turner thought that Eddie's friend C.J. was also there.  (Id. at 766.)  She said, "That was C.J. because he –he's the one that looks real young, right?"  (Id.)  In response, Detective Bayles said, "Well, you know what.  Maybe it might make this easier if I show you some pictures now."  (Id.)  He then proceeded to show her a series of pictures:

> Q:  Okay.  Let's see who's familiar if anybody on these pictures.  Okay.  Do you know this guy?
>
> A:  That was the one that used the phone, I think.
>
> Q:  Okay.  Now, a minute ago you said C.J.  Is that who you're callin' C.J.?
>
> A:  No.
>
> Q:  Okay.  And that's Camitt Doughton, and here's another guy.  Do you recognize him?
>
> A:  Not at all.
>
> Q:  This is – this is actually not a really good picture of him, but – um, I'll get another picture for you.  Okay?
>
> A:  Yeah, and that's Drebo.
>
> Q:  Okay.  This is Deandre Scott.  You know him as Drebo –
>
> A:  Mm-hm.
>
> Q:  –right?  Okay.  Um, I'll make myself a note.  Anyway, the person here that you said was – was–
>
> A:  Yeah.
>
> Q:  Who do you know this guy as?
>
> A:  I didn't know his name.
>
> Q:  Okay.
>
> A:  I –
>
> Q:  But you recognize him –

1      A: Yeah, I –

2      Q: Camitt Doughton.

3      A: –know that wasn't – I don't think that was the one that Eddie called C.J.  I
      think he called him Shabu or –

4

5      Q: Okay.

      A:  – something like that.

6

7      ****

      Q: I need to back you up for a second.  I'm sorry.  If – if–if I do this way and, um

8      – we want to go back over it a lot.  Okay?

9      A: Mm-hm.

10     Q: And I might miss something.  I just showed you a picture of a guy, the first guy
      you just saw, and I – I said that guy's name is Camitt Doughton, and did you

11     recognize that guy as one of the people that go –

12     A: Yeah.

13     Q:  – with you guys that night?

14     A: Yeah.

15     Q: Okay.

16     A: He – he went with Drebo, but he –

17     Q: Okay.

18     A:  – came back to the house.  That's how I remember his face because –

19     Q: Okay.

20     A:  – when I was sitting in the kitchen, I could him.

21     Q: So you don't think they call him C.J.?

22     A: No.  That was –

23     Q: But he's the guy who went with Drebo?

24     A: Mm-hm.

25     Q: Okay.

26     A: And I think they called him like Shabu or –

1     Q: Maybe they called him Shabu?

2     A: Yeah.

3     Q: Okay.  But –but that guy, Camitt Doughton, is the one that went with Drebo that night?

4
      A: Yeah.  He didn't get in my car.
5

6  (CT at 766-69.)

7          At trial, Turner did not identify petitioner in court.  At trial, Turner testified that

8  she did not remember many of the statements she made during the interview with Detective

9  Bayles.  When asked if she stated in the interview that she heard a man later on in the evening

10 being called Shabu, Turner testified that she did not remember.  (RT at 178-79.)

11     Q: Did you tell the officers that you thought Shabu was in the back in the passenger seat in the front of the Drebo's car?

12
       A: I don't remember.
13
       Q: And did you tell the officer that it was the guy that you showed me in the picture, with the name of Camitt Doughton?
14

15     A: I don't remember.

16 (RT at 183-84.)

17          She later testified that she did not remember identifying petitioner during the

18 interview:

19     Q: Did they show you a photograph of two other men?

20     A: Yes.

21     Q: Did you recognize one of the men?

22     A: Um, I think I did recognize one.

23     Q: And was that a man that you – they showed you the photograph and was that the man that you said that, that's what you believed was the guy they were calling
24     Shabu?

25     A: I don't remember which one it was.

26

27

1   (RT at 236-37.)

2          The prosecutor went on to show her the two photographs she was shown on

3   December 23, 2004, by Detective Bayles, one of which was of petitioner.  (RT at 238.)  When

4   asked if she remembered which one of the men in the photographs she said she recognized and

5   the other she said she did not recognize.  (Id. at 238-39.)  At trial, she testified that she did not

6   recognize either one of the men in the photographs.  (Id. at 39.)  When asked if she saw any of

7   the other men in court, i.e., referring to petitioner, that were with her that night, Turner responded

8   that she did not recognize anyone.  (RT at 241.)

9          The identification procedure used by Detective Bayles was not so impermissibly

10  suggestive and conducive to irreparable mistaken identity so as to deny petitioner due process.

11  Detective Bayles showed Turner photographs and asked if she recognized any of the people in

12  them.  This procedure did not improperly suggest to Turner that she select petitioner.   While

13  Detective Bayles identified petitioner by name, this was only after Turner identified petitioner as

14  one of the men involved on the night of the incident, whom she knew by a nickname.  The

15  undersigned agrees with the Superior Court's finding that the identification procedure used by

16  Detective Bayles was not impermissibly suggestive.

17         Even if the procedure had been impermissibly suggestive, it was reliable.  As

18  noted by respondent in the answer, Turner had ample opportunity to view petitioner on the night

19  of the crime.  Before the crime, Turner spent a few minutes in a hotel with all the four men.  (RT

20  at 187-89.)  When the four men and Turner returned to Quintanilla's house after the crime, they

21  stayed for several hours.  (RT at 223.)  Approximately two weeks had passed between the time of

22  the crime and the interview.  Turner's memory could not have faded significantly during two

23  weeks.

24         Having conducted a de novo review, the undersigned finds that this claim is

25  without merit and should be denied.

26  ////

1      *Mackelvie*

2            In his reply to respondent's answer, petitioner argues that his identification by

3   Heidi Mackelvie was impermissibly suggestive.  Petitioner does not allege that Mackelvie's

4   identification of him was the product of an impermissibly suggestive pretrial identification

5   procedure.  Instead, petitioner argues that Mackelvie's identification was unreliable because of

6   discrepancies in her description of the gunman's height as well as her repeated viewing of

7   petitioner in court.  These allegations do not state a claim for impermissible identification.

8   Accordingly, these allegations will not be addressed any further.

9            D. Ground 6: Ineffective Assistance of Counsel

10           The undersigned will address petitioner's ineffective assistance of trial counsel

11  claim (ground 6) before the ineffective assistance of appellate counsel claim (ground 5).

12           Petitioner argues that his trial counsel was ineffective for failing to file a motion

13  to suppress Turner's identification of him and for failing to request a physical line-up.  (Dkt. No.

14  11 at 6.)

15     *Legal Standard*

16           Under Strickland v. Washington, 466 U.S. 668, 687 (1984), to demonstrate

17  ineffective assistance of counsel, petitioner must show both that his counsel's performance was

18  deficient and that the deficient performance prejudiced his defense.  A deficient performance is

19  one in which "counsel made errors so serious that counsel was not functioning as the 'counsel'

20  guaranteed by the Sixth Amendment."  Id.  Petitioner must show that defense counsel's

21  representation was not within the range of competence demanded of attorneys in criminal cases,

22  and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would

23  have been different.  Hill v. Lockhart, 474 U.S. 52, 57 (1985).  An ineffective assistance of

24  counsel claim should be denied if the petitioner fails to make a sufficient showing under either

25  one of the Strickland prongs.  See Strickland, 466 U.S. at 697 (courts may consider either prong

26  of the test first and need not address both prongs if the defendant fails on one).

1    In reviewing ineffective assistance of counsel claims in a federal habeas

2  proceeding:

3    The question "is not whether a federal court believes the state court's
     determination" under the Strickland standard "was incorrect but whether that
4    determination was unreasonable—a substantially higher threshold." Schriro,
     supra, at 473, 550 U.S. 465.  And, because the Strickland standard is a general
5    standard, a state court has even more latitude to reasonably determine that a
     defendant has not satisfied that standard.  See Yarborough v. Alvarado, 541 U.S.
6    652, 664 (2004) ("[E]valuating whether a rule application was unreasonable
     requires considering the rule's specificity. The more general the rule, the more
7    leeway courts have in reaching outcomes in case-by-case determinations").

8  Knowles v. Mirzayance, 556 U.S. 111, 123 (2009).  It is through this doubly deferential lens that

9  a federal habeas court reviews Strickland claims under the § 2254(d)(1) standard.  Id. (citing

10  Yarborough v. Gentry, 540 U.S. 1, 5–6 (2003)).

11    The Supreme Court, applying the "doubly deferential standard," has made clear

12  that when adjudicating ineffective assistance of counsel claims in federal habeas proceedings,

13  unlike the situation on direct review, focus is not on whether counsel's performance fell below

14  the Strickland standard.  Rather, the focus is on whether the state-court decision holding that

15  counsel was not ineffective constituted an "unreasonable application of federal law[,] [which] is

16  different from an incorrect application of federal law."  Harrington v. Richter, 131 S. Ct. 770,

17  785 (2011).

18    Under § 2254(d), a habeas court must determine what arguments or theories
     supported or, as here, could have supported, the state court's decision; and then it
19    must ask whether it is possible fairminded jurists could disagree that those
     arguments or theories are inconsistent with the holding in a prior decision of this
20    Court.

21  Id. at 786.

22    *Analysis*

23    Petitioner raised his ineffective assistance of counsel claim in his state habeas

24  petitions.  For the reasons petitioner's suggestive identification claim is unexhausted, petitioner's

25  ineffective assistance of counsel claims is unexhausted as well.  However, because this claim is

26  without merit, it may be considered in these findings and recommendations.  The undersigned

1   conducts a de novo review of this claim, taking into consideration the opinion of the Superior

2   Court.

3          Petitioner argues that trial counsel was ineffective for failing to file a motion to

4   suppress his identification by Turner.  In his reply to the answer, petitioner also argues that his

5   trial counsel should have objected at trial to the use of a single photograph by Detective Bayles

6   during his interview with Turner.  Petitioner also argues that his counsel was ineffective for

7   failing to request a physical line-up or otherwise challenge his identification by Turner.

8          In the section above, the undersigned found that Detective Bayles's identification

9   procedure was not improperly suggestive.  For this reason, trial counsel was not ineffective for

10  failing to challenge Turner's identification of petitioner.  A motion to suppress the identification

11  on grounds that it was improperly suggestive or a request for a physical line-up to counter the

12  allegedly suggestive identification would have been denied because Detective Bayles's procedure

13  was not improper.  Accordingly, this claim of ineffective assistance of counsel should be denied.

14         In his reply to the answer, petitioner also states, "Note: Trial counsel failed to call

15  witness Porter and investigate him...witness could corroborate defense theory.  (Police Report in

16  Exhibit (B)."  (Dkt. No. 25 at 14.)   The amended petition contains no claim based on trial

17  counsel's alleged failure to call a witness who could corroborate the defense theory.  The

18  undersigned does not find that this cryptic note is an attempt to amend the amended petition to

19  include such a claim.  In any event, because petitioner did not raise this claim in the amended

20  petition, the undersigned declines to address it.[3]  Cf. Delgadillo v. Woodford, 527 F.3d 919, 930

21  n.4 (9th Cir. 2008) (holding that traverse is not proper pleading to raise additional ground for

22  relief or amend petition); Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) (same).

23

---

24         [3]  Attached to petitioner's reply is a page from an interview of Porter by the police.  (Dkt.
    No. 25 at 25.)  In this report, Porter states that petitioner, identified as C.J., and "Mone," went to
25  Elliott's house to buy some marijuana.  (Id.)  The page from this interview attached to
    petitioner's traverse contains no statement by Porter that corroborated any defense.  At trial,
26  petitioner's counsel presented no defense witnesses.

1          E.  Ground 7: Insufficient Evidence

2          Petitioner raised his insufficient evidence claim in his state habeas petitions.  For

3  the reasons petitioner's suggestive identification claim is unexhausted, the instant insufficient

4  evidence claim is unexhausted.  However, because this claim is without merit, it may be

5  considered in these findings and recommendations.  The undersigned conducts a de novo review

6  of this claim, taking into consideration the Superior Court's opinion denying this claim.

7          *Legal Standard*

8          When a challenge is brought alleging insufficient evidence, federal habeas corpus

9  relief is available if it is found that based on the evidence adduced at trial, viewed in the light

10 most favorable to the prosecution, no rational trier of fact could have found  "the essential

11 elements of the crime" proven beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,

12 319 (1979).  Jackson established a two-step inquiry for considering a challenge to a conviction

13 based on sufficiency of the evidence.  United States v. Nevils, 598 F.3d 1158, 1164 (9th Cir.

14 2010) (en banc).  First, the court considers the evidence at trial in the light most favorable to the

15 prosecution.  Id., citing Jackson, 443 U.S. at 319.  "'[W]hen faced with a record of historical

16 facts that supports conflicting inferences,' a reviewing court 'must presume-even if it does not

17 affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the

18 prosecution, and must defer to that resolution.'"  Id., quoting Jackson, 443 U.S. at 326.

19          "Second, after viewing the evidence in the light most favorable to the prosecution,

20 a reviewing court must determine whether this evidence, so viewed is adequate to allow 'any

21 rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt."  Id.,

22 quoting Jackson, 443 U.S. at 319 (emphasis in original).  "At this second step, we must reverse

23 the verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact

24 finders would have to conclude that the evidence of guilt fails to establish every element of the

25 crime beyond a reasonable doubt."  Id.

26 ////

1      *Analysis*

2          The Sacramento Superior Court denied petitioner's insufficient evidence claim for

3    the reasons stated herein:

4          Petitioner next claims that the evidence was insufficient as a matter of law to
           support a finding of the murder being willful, deliberate, and premeditated, and
5          that appellate counsel was ineffective for failing to raise this issue on appeal.

6          Petitioner, however, fails to recognize that a special circumstance of robbery-
           murder (Penal Code § 190.2(a)(17)) was found true.  As the jury necessarily found
7          that the murder was committed during the commission of a robbery, the jury
           undoubtedly convicted petitioner on a felony-murder theory based on robbery
8          murder, for which no willful, deliberate, and premeditated finding was necessary.
           As such, it does not matter whether the evidence was sufficient to show that the
9          murder was willful, deliberate and premeditated, and the claim fails and is denied.

10   (Respondent's Lodged Document No. 22 at 4.)

11          In evaluating this claim, the undersigned must begin with "explicit reference to

12   the substantive elements of the criminal offense as defined by state law."  Chein v. Shumsky, 373

13   F.3d 978, 983 (9th Cir. 2003).  Under California law, "[u]nder the felony-murder rule, a murder

14   'committed in the perpetration of, or attempt to perpetrate' one of several enumerated felonies,

15   including robbery, is first degree murder...."  People v. Lindberg, 45 Cal.4th 1, 27 (2008).  For

16   felony murder, the requisite mental state is "simply the specific intent to commit the underlying

17   felony; neither intent to kill, deliberation, premeditation, nor malice aforethought is needed."

18   People v. Hart, 20 Cal.4th 546, 608 (1999).

19          The jury found petitioner guilty of first degree murder and the special

20   circumstance that the murder was committed while petitioner was engaged in the commission of

21   a robbery.  (RT at 1505-06.)  Because the jury found petitioner guilty of murder under the felony-

22   murder theory, there was no requirement that the murder be willful, deliberate or premeditated.

23   The undersigned agrees with the reasoning of the Superior Court that the instant claim alleging

24   insufficient evidence is without merit.  Having conducted a de novo review, the undersigned

25   recommends that this claim be denied.

26   ////

F.  Ground 5: Ineffective Assistance of Appellate Counsel

For the reasons petitioner's suggestive identification claim is unexhausted, the ineffective assistance of appellate counsel claims are unexhausted.  However, because these claims are without merit, they may be considered in these findings and recommendations.  The undersigned conducts a de novo review of these claim, giving consideration to the opinion of the Superior Court.

Petitioner argues that appellate counsel was ineffective for failing to raise three issues: 1) trial counsel's failure to file a timely motion to suppress Turner's identification of petitioner; trial counsel's failure to object to Turner's in-court identification of petitioner and to request a line-up; 2) insufficiency of the evidence to support petitioner's convictions for first degree murder, personal use of a firearm and robbery; and 3) the suggestive identification procedures used by Detective Bayles.  (Dkt. No. 11 at 6.)

Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in Strickland.  Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).  A petitioner therefore must show that counsel's advice fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal.  See id. at 1434 n. 9 (citing Strickland, 466 U.S. at 688, 694).

A.  Alleged Failure to Contest Trial Counsel's Failure to Challenge Turner's Identification of Petitioner

The Superior Court rejected petitioner's ineffective assistance of appellate counsel claim alleging appellate counsel's failure to raise trial counsel's failure to challenge Turner's identification of petitioner.  (Dkt. No. 22 at 1.)  The Superior Court found that,

> As this is a matter that may be based on at least some material outside the record, appellate counsel could not have fully raised the issue on appeal and therefore was not ineffective.  Regardless, as the claim of suggestive identification is meritless, the claim of ineffective assistance of counsel by either trial or appellate counsel fails.

1  (Id.)

2        Under California law, a petition for habeas corpus is the preferred method for

3  bringing an ineffective assistance of counsel claim because such a claim requires consideration of

4  evidence outside the trial record.  People v. Salcido, 44 Cal.4th 93, 171 (2008) ("claims of

5  ineffective assistance of counsel generally must be raised in a petition for writ of habeas corpus

6  based on matters outside the record on appeal"); People v. Mendoza Tello, 15 Cal.4th 264, 267

7  (1997) ("Because claims of ineffective assistance are often more appropriately litigated in a

8  habeas corpus proceeding, the rules generally prohibiting raising an issue on habeas corpus that

9  was, or could have been, raised on appeal would not bar an ineffective assistance claim on

10  habeas corpus.") (citations omitted).

11        Appellate counsel was not ineffective for failing to raise a claim alleging trial

12  counsel was ineffective for failing to challenge Turner's identification of petitioner as this claim

13  would not have been appropriately raised on appeal.   Having conducted a de novo review, the

14  undersigned finds that this claim is without merit.

15        B.  Alleged Failure to Directly Challenge Detective Bayles' Suggestive

16  Identification Procedures

17        Petitioner argues that appellate counsel should have directly challenged the

18  allegedly suggestive identification procedures used by Detective Bayles.  In its reasoned opinion,

19  the Superior Court found that the procedures used by Detective Bayles were not improperly

20  suggestive.  The undersigned also found that the procedures were not improperly suggestive.

21  Under these circumstances, a claim by appellate counsel challenging Detective Bayles's

22  procedures would have been denied as without merit.  Therefore, petitioner was not prejudiced

23  by appellate counsel's failure to raise this claim on appeal.

24        Having conducted a de novo review, the undersigned finds that this claim is

25  without merit.

26  ////

1       C.  Alleged Failure to Raise Claims Challenging Sufficiency of Evidence to

2  Support Murder Conviction

3       Petitioner alleges that appellate counsel should have argued that there was

4  insufficient evidence to support his murder conviction because there was no evidence that it was

5  willful, deliberate or premeditated.

6       As discussed above, the Superior Court rejected petitioner's claim that appellate

7  counsel was ineffective for failing to argue that there was  insufficient evidence to support a

8  finding that the murder was willful, deliberate and premeditated.  (Dkt. No. 22 at 4.)  The

9  Superior Court found that because petitioner was found guilty based on the felony-murder theory,

10  the jury was not required to find that the murder was willful, deliberate or premeditated.  (Id.)

11  For these reasons, appellate counsel was not ineffective for failing to raise this claim on appeal.

12  (Id.)  The undersigned agrees with the reasoning of the Superior Court regarding this claim.

13       Having conducted a de novo review, the undersigned finds that this claim is

14  without merit and should be denied.

15       D.  Alleged  Failure to Raise Claim Challenging Sufficiency of the Evidence to

16  Support Convictions for Personal Use of a Firearm

17       Petitioner alleges that appellate counsel should have argued that there was

18  insufficient evidence to support his convictions for personal use of a firearm.  Neither the

19  Superior Court nor respondent in the answer have addressed this claim.

20       In determining whether appellate counsel was ineffective for failing to raise a

21  sufficiency of the evidence claim on appeal, the undersigned first sets forth the standards

22  California appellate courts use to evaluate insufficient evidence claims.[4]

23

24       [4]  The Superior Court petition referenced this claim and cited some testimony in support.
Because it is clear that this claim is not exhausted as it was not properly presented to the
25  California Supreme Court, the undersigned need not determine whether these brief references
adequately alerted the Superior Court to the existence of the claim so as to satisfy the exhaustion
26  requirement.

1    "On appeal, an appellate court deciding whether sufficient evidence supports a

2    verdict must determine whether the record contains substantial evidence – which we repeatedly

3    have described as evidence that is reasonable, credible, and of solid value – from which a

4    reasonable jury could find the accused guilty beyond a reasonable doubt. [Citation.]"   People v.

5    Hovarter, 44 Cal.4th 983, 996–97 (2008)( italics deleted).

6    "'In assessing the sufficiency of the evidence, we review the entire record in the

7    light most favorable to the judgment to determine whether it discloses evidence that is

8    reasonable, credible, and of solid value such that a reasonable trier of fact could find the

9    defendant guilty beyond a reasonable doubt. [Citations.]' [Citation.] We resolve all conflicts in

10   the evidence and questions of credibility in favor of the verdict, and indulge every reasonable

11   inference the jury could draw from the evidence. [Citation.] This standard applies whether direct

12   or circumstantial evidence is involved. [Citation.] ... Reversal is unwarranted unless "'upon no

13   hypothesis whatever is there sufficient substantial evidence to support [the conviction].'"

14   [Citation.]"   People v. Mendez, 188 Cal.App.4th 47, 56 (2010).

15   Regarding his conviction concerning Larry Elliott, California Penal Code section

16   12022.53(d) provides, in relevant part, that any person who, in the commission of a robbery,

17   personally and intentionally discharges a firearm and proximately causes great bodily injury or

18   death, to any person other than an accomplice, shall be punished by an additional and

19   consecutive term of imprisonment in the state prison for 25 years to life.

20   Regarding his conviction concerning Heidi Mackelvie, California Penal Code

21   section 12022.53(b) provides that any person who, in the commission of a robbery, personally

22   uses a firearm, shall be punished in the state prison for ten years.

23   1. Conviction For Use of a Firearm Involving Larry Elliott

24   Three witnesses, Kobra Turner, Heidi Mackelvie and James Willis, provided

25   testimony relevant to petitioner's conviction for personally using a firearm.

26   ////

1        *Turner Testimony*

2        While Turner was not an eyewitness to the events at Elliott's house, her testimony

3   contained relevant background information regarding petitioner's involvement in the incident.

4        In relevant part, Turner testified that she drove her boyfriend, Edward Quintanilla,

5   and the man known as C.J., to a park.  (RT at 190.)  When they got there, they saw Drebo and

6   Shabu, i.e. petitioner, in Drebo's car.  (Id. at 196.)  Shabu and C.J. then left the cars.  (Id. at 196.)  Turner

7   testified that she could not recall telling Detective Bayles that Shabu and C.J. told Eddie and

8   Drebo that they were going to a house and they said that they would let Eddie and Drebo know

9   when the guy was there.  (Id. at 198.)  Some time later, Eddie got a phone call.  (Id. at 199.)

10  After receiving the phone call, Eddie and Drebo left.  (Id. at 200.)

11       Some time later, the four men returned to the cars.  (Id. at 205.)  All four men

12  were running.  (Id. at 205-06.)  When Eddie and C.J. returned to her car, Turner then saw a white

13  plastic bucket in her car that had not been there before.  (Id.)  As they were driving, she heard

14  Eddie say, "who capped him."  (Id. at 211.)  No one responded.  (Id. at 212.)

15       *Mackelvie Testimony*

16       Heidi Mackelvie was not an eyewitness to the shooting of Elliott.  However, her

17  testimony provided relevant information regarding petitioner's actions at Elliott's house.

18       Heidi Mackelvie testified that on the night of the crime, she was at home with

19  Elliott and their son.  (Id. at 126-27.)  Some time later, George Porter, aka "Country" and James

20  Willis, aka "Quani," arrived.  (Id. at 127, 131.)  The three men went in the garage.  (Id. at 133.)

21  Mackelvie stayed in the living room on the couch.  (Id. at 133, 349.)  Her son was in his

22  bedroom.  (Id. at 349.)  A little before ten p.m., she heard the garage door open and someone

23  stepped into the room over the baby gate.  (Id. at 350.)  She felt something pushing against her

24  head.  (Id.)  She looked up and there was a gun at her head and someone told her to get on the

25  floor and not to look at him.  (Id.)  Mackelvie got down on the floor.  (Id. at 351.)  She could see

26  that the person was wearing a black hoodie and was not too tall.  (Id.)  The person had a sweater

or hoodie pulled up over his face.  (Id. at 352.)  Everything below his nose was concealed.  (Id.)
She could tell the person was black and probably in their 20's.  (Id. at 352-53.)  She had never
seen this person before.  (Id. at 353.)

Mackelvie later gave the man pointing the gun at her $140 from her purse.  (Id. at
360.)

Mackelvie heard someone else come into the house.  (Id. at 355.)  She saw
someone going into the bedroom.  (Id.)  This person had a hoodie sweater on, was of medium
height and it appeared he had a gun, but she could not see him clearly.  (Id.)  She did not get a
good look at this person, but she saw he was about 5'10" or 5'11".  (Id. at 356.)  She could tell
that this person was also black.  (Id.)  The person holding the gun to her head was 5'4" or 5'5".
(Id.)  He weighed around 140 pounds.  (Id. at 357.)

The person holding the gun to her head kept asking her, "where are the keys,"
"where's the money."  (Id.)  Mackelvie testified that the gun that was pointed at her head was a
semi automatic rather than a revolver.  (Id. at 354.)  She gave the man $140 from her purse.  (Id.
at 360.)

The hoodie of the man who was pointing the gun at Mackelvie fell so that she
could see more of his face.  (Id. at 361.)  For 15 to 30 seconds she saw his face.  (Id.)  The men
went back out into the garage and Mackelvie ran out the front door.  (Id. at 362.)

Before the man with the gun returned to the garage, she heard him yelling, "if
somebody doesn't tell me where the fuck the money is, somebody is gonna get popped."  (Id.)

When she was interviewed by the police, Mackelvie stated that the man with the
gun was 5'7" and 150 pounds.  (Id. at 375.)  She also said he was black and around 20 to 23 years
old. (Id.)

Mackelvie testified that she attended petitioner's preliminary hearing.  (Id. at 378.)
At the preliminary hearing, Mackelvie recognized petitioner as the man who had pointed the gun
at her.  (Id. at 381.)  Mackelvie testified that prior to trial, she attended every court proceeding in

the case.  (Id. at 382.)  Mackelvie testified that she identified petitioner as the man who pointed the gun at her at Danny Hampton's trial in June of 2007.  (Id. at 383.)  She did not recognize Danny Hampton at the June 2007 trial.  (Id. at 385.)  At petitioner's trial, she also identified petitioner as the man who pointed the gun at her.  (Id.)  She did not recognize Deandre Scott, petitioner's co-defendant, at the trial.  (Id. at 386.)

On cross-examination, Mackelvie stated that during the incident she was "scared to death."  (Id. at 471-72.)  After the incident, she told officers that she tried looking at the face of the man with the gun but did not get a good look.  (Id. at 472.)  She told officers that she could not remember anything about the man with the gun other than that he was a clean looking black male adult.  (Id. at 474-75.)

Six months later, she stated that the hood of the man with the gun's sweat shirt was pulled back and she could see his hair.  (Id. at 475.)  She stated that petitioner's hairstyle in June 2005 was the same as it had been at the time of the incident.  (Id.)

During Danny Hampton's trial, Mackelvie testified that she recognized petitioner because of his ugly face.  (Id. at 480.)

*Willis Testimony*

As will be discussed herein, James Willis was the only witness to the shooting of Willis, although he did not actually see petitioner fire the shots.

James Willis testified that on the night of the incident, he was at Elliott's house.  (Id. at 548-49.)  At some point, George Porter arrived.  (Id. at 550.)  The three men were in the garage.  (Id. at 552-53.)

Willis testified that he knew Danny Hampton.  (Id. at 554.)  At some point, Elliott received a phone call from Danny Hampton.  (Id. at 554-56.)  Elliott hung up the phone and Willis called Hampton back on Elliott's phone.  (Id. at 557.)  Hampton's nickname was Shabu or Baboon.  (Id.)  Hampton told Willis that he wanted to come over to Elliott's house to buy some marijuana.  (Id. at 560.)  Elliott had marijuana in white five gallon paint buckets in his garage.

1   (Id. at 561.)

2          About twenty minutes later, Hampton and C.J. arrived.  (Id. at 563.)  Willis did

3   not know C.J. personally, but he knew him around the neighborhood.  (Id. at 564.)  Willis did not

4   know C.J.'s real name.  (Id. at 566.)  At trial, Willis identified petitioner as C.J.  (Id. at 566.)

5   Marijuana was then passed around.  (Id.)  Willis smoked some.  (Id.)  About seven minutes after

6   Hampton and C.J., i.e. petitioner, arrived, two masked men arrived.  (Id. at 571.)  In particular,

7   when asked if anyone else arrived after petitioner and Hampton, Willis testified, "Masked –

8   masked men just – I seen a gun, and just all black and I just lay on the ground."  (Id.)  He later

9   testified that one of the masked men had a gun.  (Id. at 577.)  Willis testified that the masks were

10  black with the eye part cut out.  (Id.)  The masks appeared to made out of cotton.  (Id.)  Willis

11  could only see the eyes through the masks.  (Id. at 578.)  The gun that the masked man appeared

12  to be holding was a revolver.  (Id. at 580.)

13         Willis first testified that petitioner had on "regular clothes."  (Id. at 568.)  Later,

14  he later testified that he could not recall.  (Id. at 572.)  After being shown a transcript from his

15  interview with police on December 15, 2004, he recalled that Hampton, aka Shabu, was wearing

16  jeans with a dark gray hoodie sweater.  (Id. at 573.)  He remembered that petitioner was wearing

17  jeans and a black hoodie sweater, but he could not remember the color.  (Id. at 574-75.)

18         The masked men then went to Elliott.  (Id. at 581.)  Willis then heard Elliott cry

19  out in pain.  (Id.)  He heard Elliott say, "Stop, ya'all are killing me."  (Id. at 582.)  Willis heard

20  someone say, "Where's the money."  (Id at 583.)  Willis recognized the masked man with the

21  gun as making this statement.  (Id.)  Willis saw one of the masked men go into the house.  (Id.)

22  Willis was unable to "perceive" whether anybody else was going in and out of the house from

23  where he was.  (Id. at 584.)

24         At some point, Danny Hampton kicked Willis and said, "Don't worry.  Everything

25  is going to be all right."  (Id. at 584.)  About two minutes later, the masked man with the gun told

26  Willis to get up and turn on music.  (Id. at 585.)  Willis got up and started pressing the buttons on

1   the keyboard in the garage.  (Id.) Willis could not see anybody from the keyboard.  (Id. at 586.)

2          As the two masked men, Hampton and C.J. were getting ready to leave, Willis

3   heard someone say "If you say another word, I'm going to shoot you."  (Id. at 588.)  Willis did

4   not know who made this statement.  (Id. at 589.)  At this point, he had not seen Hampton, C.J. or

5   the second masked man with a gun.  (Id.)  Willis saw three of the men running out the garage.

6   (Id. at 590.)

7          After the incident, Willis had a "flashback," as a result of which he remembered

8   that the masked man with the gun threw the gun back as he was leaving.  (Id. at 590-91.)  Willis

9   did not see anyone catch the gun.  (Id.)  Willis then heard C.J., i.e. petitioner, say, "I told you not

10  to look up."  (Id. at 591.)  Willis then heard a gunshot.  (Id.) After that, petitioner came up behind

11  Willis and said, "Don't say nothing."  (Id. at 593.)  Petitioner than ran from the garage.  (Id. at

12  599.)

13         On cross-examination, Willis testified that the flashback had occurred on March

14  2, 2008, while he spoke to an investigator from the District Attorney's Office.  (Id. at 750, 779.)

15         On re-direct, Willis testified that he did not know where petitioner was at all

16  times.  (Id. at 806.)  He testified that he thought that the masked man with the gun never left the

17  garage, but the other masked man may have gone in the house.  (Id.)

18         Regarding his state of sobriety, Willis testified that he, Elliott and Porter had

19  smoked three joints between them.  (Id. at 569.)  Then, when petitioner and Hampton arrived, he

20  took a hit off another joint.  (Id. at 570.)  Willis testified that he drank a 12 ounce can of

21  Budweiser and had started a second one but had not had time to finish it.  (Id.)  Willis testified

22  that he had smoked marijuana for a long time so he had a high tolerance for it.  (Id.)  He testified

23  that at the time of the incident he was "pretty much sober."  (Id.)  However, when told that the

24  legal limit for alcohol is .08, he testified that he was "probably point six."  (Id.)  Willis most

25  likely meant to testify .06.

26  ////

1    Willis also admitted that when initially questioned about the incident, he did not

2    tell the police that petitioner and Hampton were at Elliott's house before the masked men arrived.

3    (Id. at 605.)  Willis testified that he did not identify petitioner and Hampton because he was

4    afraid of what would happen if he snitched.  (Id. at 605-06.)  Willis told the truth after officers

5    later told him  that they were going to charge him with murder.  (Id. at 610.)  As a result of his

6    testimony in petitioner's case, the District Attorney's Office relocated Willis.  (Id. at 644.)

7        *Analysis*

8        Willis was the only witness to testify regarding petitioner's involvement in the

9    shooting of Elliott.  Some of his testimony regarding the events leading up to the shooting was

10   corroborated by other witnesses.  For example, both he and Turner testified that petitioner arrived

11   at Elliott's house with Hampton, and that petitioner was not one of the masked men.  Mackelvie

12   also corroborated Willis's testimony that petitioner was not one of the masked men, as she

13   testified that petitioner wore a hoodie and not a mask.

14       However, Willis's testimony regarding petitioner's involvement in the shooting

15   had credibility issues.  The timing of Willis's "flash back" memory was somewhat suspect, in

16   that it occurred just days before petitioner's trial, i.e. approximately four years after the shooting.

17   The "flash back" memory was also difficult to reconcile with some of Mackelvie's testimony.  If

18   petitioner already had a gun, as Mackelvie testified, then it is unclear why the armed masked man

19   would later throw his gun back, presumably to petitioner.  Also affecting Willis's credibility and,

20   in particular, his memory of events, was his level of intoxication at the time of the shooting.

21   Willis himself gave conflicting testimony regarding his level of intoxication.  He testified that he

22   felt sober (despite drinking beer and smoking marijuana), but that his level of intoxication was

23   .06.

24       Under California law, a witness is incredible as a matter of law only if the matters

25   testified to by the witness are physically impossible or inherently improbable.  See People v.

26   Young, 34 Cal.4th 1149, 1181 (2005); People v. Stangler, 18 Cal2d 688, 691-92 (1941).  While

Willis's "flash back" memory regarding the shooting had credibility issues, it was not incredible as a matter of law.  It was physically possible for petitioner to have shot Elliott.  Because petitioner was present and at least one other witness saw him with a gun before the shooting, it was not inherently improbable that he shot Elliott.

Petitioner argues that Willis did not actually see him shoot Elliott.  However, Willis testified that he heard petitioner say, "I told you not to look up."  Willis then heard a gunshot.  After that, petitioner came up behind Willis and said, "Don't say nothing."  From this testimony, a reasonable jury could infer that petitioner shot Elliott.   For these reasons, under California law, there was sufficient evidence from which a trier of fact could find that petitioner personally Elliott.

Because there was sufficient evidence that petitioner personally used a firearm under California law, petitioner was not prejudiced by appellate counsel's failure to raise this claim on appeal.  Had this claim been raised, it would have been rejected by the state appellate court for the reasons set forth above.  Accordingly, this claim should be denied.

2. Conviction for Use of a Firearm Involving Heidi Mackelvie

Petitioner argues that appellate counsel should have argued that there was insufficient evidence that he used a firearm during the robbery of Mackelvie.

As discussed above, Mackelvie testified that petitioner pointed a gun at her head and asked her for money.  This testimony was sufficient evidence of petitioner's use of a firearm during his robbery of Mackelvie.  Petitioner's main challenge to this particular conviction appears to be Mackelvie's identification of him as the man holding the gun to her head.  As discussed above, on cross-examination, Mackelvie was questioned regarding her identification of petitioner as the gun man.

Mackelvie's identification of petitioner as the gun man was not  physically impossible or inherently improbable.  See People v. Young, 34 Cal.4th at 1181; People v. Stangler, 18 Cal2d 688, 691-92 (1941).  Two other witnesses, Turner and Willis, identified

1  petitioner as one of the robbers.  Turner and Willis also testified that petitioner was not one of the

2  masked men, bolstering the credibility of Mackelvie, who described petitioner as wearing a

3  hoodie pulled up on his face (as opposed to a mask).  Under these circumstances, a challenge by

4  appellate counsel to the sufficiency of the evidence to support petitioner's conviction for use of a

5  firearm in connection with his robbery conviction involving Mackelvie would have been denied.

6  Because appellate counsel was not ineffective for failing to raise this claim, this claim should be

7  denied.

8      E.  Alleged  Failure to Raise Claim Challenging Sufficiency of the Evidence to

9  Support Robbery Convictions

10     Petitioner argues that appellate counsel was ineffective for failing to challenge the

11  sufficiency of the evidence to support his robbery convictions.  Neither the Superior Court nor

12  respondent in the answer have addressed this claim.

13     California Penal Code Section 211 defines robbery as the felonious taking of

14  personal property in the possession of another, from his person or immediate presence, and

15  against his will, by means of force or fear.

16     As discussed above, Mackelvie testified that she gave petitioner $140 while he

17  had a gun pointed at her.  (RT at 360.)  This testimony was sufficient evidence to support

18  petitioner's robbery conviction involving Mackelvie.  Appellate counsel was not ineffective for

19  failing to challenge the sufficiency of the evidence of this conviction.

20     Petitioner's robbery conviction of Elliott was based on the taking of marijuana

21  from Elliott's garage.  The following evidence was submitted in support of this conviction.

22  James Willis testified that on the night of the incident, he was at Elliott's house putting

23  marijuana in little bags.  (Id. at 551.)  Willis testified that Ellis kept the marijuana in white paint

24  buckets in his garage.  (Id. at 561.)  Kobra Turner testified that after Quintanilla returned to her

25  car from Elliott's house, she saw a white plastic bucket in her car that had not been there before.

26  (Id. at 207.)

1        Tanysha Cummings testified that in December 2004 she lived with her sister,

2 Brandi Cummings, in Tracy, California.  (Id. at 446-47.)  She testified that petitioner, identified

3 as C.J., stayed at the apartment for five or six days in December 2004.  (Id. at 449-60.)  Brandi

4 Cummings testified that there was another man named Shabu with petitioner when he arrived at

5 her apartment.  (Id. at 836.)  Brandi testified that they had a yellow and black backpack.  (Id. at

6 837.)

7        Sacramento County Sheriff's Deputy Roberts testified that he searched the

8 Cummings apartment on December 17, 2004.  (Id. at 859.)  Deputy Roberts found a yellow and

9 black backpack during the search.  (Id. at 860.)  Eight grams of marijuana and a scale were found

10 in the backpack.  (Id. at 863.)  Also found in the backpack were several  plastic baggies.  (Id.)

11 Deputy Roberts testified that marijuana is often sold in this type of baggie.  (Id. at 864-65.)

12        From the testimony set forth above, as well as the other facts of the case set forth

13 in these findings and recommendations, a reasonable jury could find that petitioner robbed Larry

14 Elliott of marijuana.  It is clear that petitioner and the other three men went to Elliott's house

15 with the intent to rob him of marijuana.  The yellow and black backpack that petitioner brought

16 to Tanysha Cummings's apartment had marijuana in it as well as plastic baggies.  James Willis

17 testified that he had been bagging marijuana  at Elliott's house just before the robbery.  In

18 addition, Willis testified that Elliott kept his marijuana in white plastic buckets.  Kobra Turner

19 testified that she saw a white plastic bucket in her car after the men returned to her car.  From this

20 evidence, a reasonable jury could find that petitioner robbed Elliott of the marijuana.

21        A claim by appellate counsel that there was insufficient evidence to support his

22 conviction for robbing Elliott would have been denied.  For this reason, appellate counsel was

23 not ineffective for failing to raise this claim on appeal.

24        For all of the above reasons, IT IS HEREBY RECOMMENDED that petitioner's

25 application for a writ of habeas corpus be denied.

26 ////

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).

Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  April 12, 2013

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

do2252.157(2)